Escamilla v. Stephens, Ms. Penrose. Ready. Good afternoon, and may it please the court. My name is Mary Margaret Penrose, and I've been appointed by this court to represent the petitioner, Licho Escamilla. This is actually a very simple case. In fact, this case can be summed up by a single number, the number 11. 11 is the total number of combined investigative hours the state court attributed to two attorneys, one investigator, and an administrative assistant. This number, however, was contradicted by Licho's stepsister, Brenda Hinojosa, in sworn testimony before the state habeas court, who claims that the time spent with the family was far, far less than trial counsel's affidavit suggests. Yet even were this court to accept the controverted testimony of trial counsel, 11 hours may be the most embarrassing display of representation I have found in any capital case to date. I personally have worked on eight death penalty cases. I've lost three clients to execution, and I have never. We just need you to stick to the record in this case. Absolutely. In this case, Your Honor, there's no investigative file. Absolutely none. Not for Mr. Huff, not for Ms. Busby, not with the investigator. There's no affidavit from the investigator in this case, presumably because there is no true investigation that was ever undertaken. 11 also becomes relevant because trial counsel's involvement of an expert was done at the 11th hour, after jury selection had already begun, and was done without ensuring that the expert even had an accurate family history. I thought we had some case law that approved of some fairly late use of investigators. I think that's accurate, Your Honor, provided that that investigator is given accurate family history. In this case, the expert, Dr. Pearson, was not told that the Escamilla family had nearly every male member of the family with a violent criminal past. And the letter that was given to counsel in this particular case, Your Honor, arrived nearly one month after my client was sentenced to death. I'm not aware of any case, Your Honor, where the court has found that getting an expert's opinion after the sentence of death constitutes adequate, constitutionally effective assistance of counsel. While the state habeas corpus court found that trial counsel had an awareness of the fact that both of Leach's brothers were in state custody at the time of his capital murder trial, this was not conveyed to the investigator. This was not conveyed to the expert that was obtained during jury selection. And once that information was passed on, it does not appear in the record that it was ever corrected by either attorney, which suggests either that the attorney didn't read the report, which came in late, or the attorney did nothing after the actual evaluation was reported was issued. And what specifically, what is the investigation that you claim should have been done that was not done? Actually, there are a myriad of items that should have been completed, Your Honor. Foremost among them is receiving an unredacted version of the TYC records that the prosecution asked for and the state did not. In that instance, it appears that the defense counsel, both Mr. Huff and Ms. Busby, would have been aware that that was a file and information that the prosecution was intending to rely upon in this case. And even with that information, knowing that the state was seeking the unredacted records, these two attorneys never, ever sought or received that information. The most vital part of what's contained in those records, Your Honor, in this particular case, is that while Mr. Huff argued during closing arguments that prior to age 11, Mr. Escamilla was pretty much a normal kid, in fact, the unredacted records demonstrate that this was a child that at age nine was already consuming regular amounts of alcohol. Those same unredacted records, Your Honor, demonstrate at age nine, Mr. Escamilla was already dealing with intoxication. There was no one in the household other than the two parents who would have been capable of providing Mr. Escamilla that alcohol. Had trial counsel seen that the date that Mr. Escamilla first began dealing with substances, particularly in this case alcohol, was age nine, certainly they could not have portrayed the father, as they did during the punishment phase, as a sympathetic figure. Because in the state of Texas, giving alcohol to a child, particularly the point of intoxication, is in and of itself a felony offense. So this is a family that is not normal. This is a family that is very disturbing to learn about the facts. And had the counsel looked at the unredacted records, they also would have realized that Mr. Escamilla started using marijuana at age 12, claimed to be a member of a gang well before age 11. So when we're talking about the unredacted records, vital pieces of information that were clear and obvious on the surface were never obtained, certainly were not considered, and were quite honestly unknown to trial counsel. Another thing that should have occurred, your honor, is the investigator should have tried to determine some of the individuals outside of the family. In this case, there were only two family members that were actually relied upon by trial counsel. The father, who as I indicated, was one of two parents in the household when my client was becoming intoxicated at age nine. The other was a stepsister, Brenda Hinojosa, who testifies on the record that she didn't think that Lecho was much of a drinker. Any trial attorney that would have had the unredacted records would have known that that was false information they were getting from the family. Those were the only two witnesses contacted by the attorneys. Then you look at the other, as far as family members. There were two other male family members that should have been interviewed. There was difficulty reaching both of them because at the time of Mr. Escamilla's trial, they were both in custody. In fact, Mr. Escamilla's brother was arrested shortly before the murder for having 200 grams of cocaine in the family house, which of course is a felony. He ultimately was sentenced and I think is still in federal custody. At the same time that Mr. Escamilla was being tried in this case, his other brother was in the same Dallas County loose derrick jail. So when the attorneys in their affidavits say they had difficulty locating them, that's somewhat difficult to accept because they were in state custody and would have been quite easy to find. The very fact that both brothers were in state custody would have encouraged a reasonably competent lawyer at the time, not calling upon hindsight, but looking at trial's counsel's activity at that moment, that this was a family that had a horrible issue with crime. They then, had they looked at those records, Your Honor, I think the next record they should have done is run a family crime history, as was done by state habeas counsel. And then you would have realized that the father, the person that was portrayed by counsel, and to this day, the trial counsel says they would still give this same strategy or approach, had two offenses himself for guns and alcohol. Why is that legally relevant in this case? Because Mr. Huff stood before the jury and falsely argued that until age 11, Mr. Escamilla had never had two instances in his life or two tools in his life that first came about at age 11, and that was guns and alcohol. Even a cursory evaluation of the unredacted records would have indicated a very serious substance abuse problem, not only with Mr. Escamilla, but in the family, gang affiliation with the family. And that argument was false when it was made because Mr. Huff had earlier argued to the jury that Mr. Escamilla's older brother, three years older, had actually shot a man who had beaten up my client, Mr. Escamilla. It's absolutely tragic in this case that Mr. Escamilla was raised in a family that was filled with alcohol and gun violence, and a reasonable attorney, knowing both of the other brothers in the family were in custody at that exact time, would have certainly done more than ask the father, but did you raise them well? Did you try to teach them right from wrong? So those are other issues. I think another thing that could have happened is they might have spoken with some of the probation officers that actually dealt with Mr. Escamilla. State Habeas Council in this case had no difficulty locating the records that I'm speaking about, or other witnesses. Other witnesses who provided affidavit testimony to the State Habeas Court that demonstrates that Mr. Escamilla was physically violent towards his wife. They both recount under sworn testimony in an affidavit that she had bruises, they remember seeing black eyes. They knew the father was violent and angry and abusive, that alcohol was a common occurrence in this family. One of the two arrests for Mr. Escamilla is he was found behind the steering wheel of his truck, passed out drunk, with a gun on his lap. I thought there weren't any convictions. That may be correct, I apologize, Your Honor. Two arrests, and I don't exactly know ultimately how the case was resolved, but he was arrested, and those records came up very easily for both State Habeas. What can one infer from an arrest that doesn't lead to a conviction? I certainly think that under the case law we have, whether you're looking at Strickland, whether you're looking at the Terry Williams case, whether you're looking at Williams, whether you're looking at Rompilla, whether you're looking at Sears, that what a reasonable attorney would take from those two arrests, in combination with the fact that the two other brothers were in custody at that exact same time, is that this young man is a product of his environment, that this young man required further investigation. When we look at the investigation that took place, as I said, it was 11 hours. That is a meager time when you're talking about a capital case, with the information. Had they had that information that the father had been arrested, they might have inquired further about that. I think a reasonable attorney would ask follow-up questions. Why were you arrested? Are there any other arrests in the family? And they would have found out that Mr. Escamilla's stepson, not, sorry, his son in another marriage, has a murder conviction. When you look at all of the crimes presented to the state court by state habeas counsel,  and a very, very different picture than was presented to the jury. The ABA governing standards at the time of this trial, from 1989, guideline 18.8.2.C, as in cat, counsel should seek to ensure that the client is not harmed by improper, inaccurate, or misleading information being considered by the sentencing entity or entities in determining the sentence to be imposed. That guideline was surely violated when Mr. Huff himself argued that persons prior to age 11, Mr. Escamilla, my client, was a normal kid, was anything but normal. He had a substance abuse addiction problem by age 11. When he also said up until age 11, he hadn't been faced with guns and alcohol, that was a patently false statement, another violation of that particular guideline. He said he hadn't been facing them. He said that wasn't a part of his, in other words, he himself wasn't using that. And I don't see any evidence that he was using guns. The fact that your father owns a gun doesn't mean that you are using a gun. I mean, Texas is full of people who have guns. It doesn't mean their kids at eight years old are using the gun. I agree with you, Your Honor, but there is no doubt that the unredacted records demonstrate at age nine, Mr. Escamilla was addicted to alcohol. So at least half of that statement was patently false and using the number 11 as a guideline, that's off by a minimum of two years. So Mr. Huff was complicit in providing a false narrative that the state seized upon in closing argument. The state argued essentially that Mr. Escamilla had a privileged upbringing, that you can't look at his life and say he's like other individuals. That's before the court facing this crime because of any disadvantages in his life. He had a loving father who taught him right from wrong. Again, had counsel actually learned of those two arrests, the alcohol problems in the family, had found out from those other witnesses that this is a man who struck his wife, leaving bruises, I think counsel would have been certainly more circumspect and less likely to use the father as a sympathetic figure. He wasn't a sympathetic figure. He is likely the very reason Mr. Escamilla and his other brothers have had problem with the law his entire life. This is a case, I have struggled quite honestly, Your Honors, to look at any other case to find facts similar to this. At the appellate court level, at the Supreme Court level, where you have a false narrative being presented by your own attorneys. I understand the state's going to use whatever argument they can. But I have not seen a case, certainly before the United States Supreme Court, any case where two attorneys and an investigator combined give us 11 hours. No investigative file. No clarity in the state affidavits demonstrating what they did during those 11 hours. And then standing before the jury and falsely arguing, he's a normal kid before the time he was age 11. He absolutely was not. We have cases before the United States Supreme Court that demonstrate when you know that the state's going to rely on particular records, you have a duty as reasonably competent attorney to make sure you look at those records yourself to make sure that any quoted material that's being used is not being falsely stated. If Your Honors would like, I would like to move on to the prejudice part of my argument. Because I think in this case, unless there are further questions, I think this is a case where deficiency is quite easily demonstrated. Looking at Rompi, I'll read the last case I have from Rompi, or the last quote. With every effort to view the facts as a defense lawyer would have done at the time, it's difficult to see how counsel could have failed to realize that without examining the readily available file, they were seriously compromising their opportunity to respond to a case for aggravation. Without making reasonable efforts to review the file, defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the record. No reasonable attorney would forego examination of the file thinking he or she could do as well simply by asking the defendant or family relations whether they recalled anything helpful or damaging. I thought in Rompi, the situation was that this was evidence that the state had indicated it was going to use so that the unwillingness to look at that information was much more serious.  in a nuanced fact, Your Honor, but I'm not sure I would say it is more serious. When an attorney knows that items are redacted and you have a client that you're representing in a capital case and the state says, Your Honor, we'd like to have the unredacted records. I cannot imagine the United States Supreme Court not analogizing Rompi and saying in this particular case, knowing when the state seeks those unredacted records that a reasonably competent attorney at that exact same time would not also seek those unredacted records. What reason possibly could any reasonably competent attorney have for saying, we don't need the unredacted records. We're good with the redacted records because in the unredacted records, every item dealing with substance abuse, particularly the information, the... Aren't you just arguing the deficiency? I'm, yes, Your Honor. I'd like to move on to prejudice unless there are further questions about deficiency because I think deficiency is absolutely... Your, of course, big problem, as has been stated before, is whether or not the aggravating circumstances of this crime and the interview on TV after two murders is so substantial that there's no way, no matter what these attorneys had done, that they could have overcome that prejudice. I'm opposing that. I understand the argument, Your Honor. I'm not saying we have decided that. Absolutely. But that is, to me, is your challenge. You're absolutely correct, Your Honor, and I think that's a hypothetical challenge in the sense of we hear individuals always say, well, the crime is so heinous, the crime is so grievous. Let me give you two instances or two reasons why I disagree that that argument suffices in this case. One, Terry Nichols. This court certainly knows Terry Nichols. He was part of the Oklahoma City bombing, the worst American terrorist we have that's still alive. He was given a life sentence not once but twice. He faced over 161 counts of murder, including children. I don't think you can get facts that are nearly that egregious, except for the second case I'd like to draw the court's attention to. Zacharias Massai. He was part of the 9-11 bombing. He's the only one we've been able, as a society, to capture and try. He also received a life sentence. So when someone, not the court, but certainly when I hear that argument, I think to myself, no, with competent counsel, no crime standing in and of itself. If what happened in Oklahoma City and what happened at 9-11 standing alone is not sufficient. Yeah, but the problem is you have more than just the crime. You have his, not only lack of remorse, but almost glee about it after the fact. Absolutely, Your Honor. And I don't think you have, you certainly don't have that with Terry Nichols. I don't know enough about Massai. I know a lot about Terry Nichols. And he didn't go on TV and say how joyous he was about all of these children and people dying. You raise an absolutely critical point, Your Honor. Dr. Pearson and his affidavit, and he's the investigator that was, I'm sorry, he's the expert that was obtained during trial, during jury selection, spoke himself about the odd way that Mr. Escamilla talked about the crime, as if he was a child and he said, pow, pow, pow. And when you read that letter, you realize that there needed to be some investigation as why this individual was not able to appreciate the consequences of his action. We know that- Well, you haven't developed that at all. I mean, your argument about the alcohol use and family and all of that has been well-developed, but the notion that he didn't know what he was doing when he committed the crime is not before us. I agree, Your Honor. In this particular case, it's not only, this court is going to have to weigh the aggravating versus the mitigating circumstances. And one of the things that our evidence takes away from the state of Texas is the entire theory of their case. The entire closing argument that focused on the responsibility, on the free choice of Mr. Escamilla, completely evaporates when you demonstrate that this is a person that's a tragic product of his environment. You would have been able to use the evidence of Vicki White, who was originally a daycare provider and later becomes a probation officer. In her affidavit during the state habeas court proceeding, she says, and this is her September 29th, 2005 affidavit, I don't believe that Licho ever had a chance in life because of the influence of the gang members and his brother's involvement with the gang and his influence on Licho. It has been my experience that a child growing up in that environment of guns and violence cannot escape without a major intervention. She would have been one of the witnesses that would have explained as a child, he was dressed in rags, he was mistreated, she knew at an early age. In addition, we would have been able to contextualize this man's behavior in a family where violence was a response. It's very difficult for those of us in this courtroom to understand. I mean, certainly the facts are quite disturbing. But Mr. Escamilla thought that violence was a way of life. I don't think to this day he appreciates the gravity. When you talk about how would we look at the aggravating versus the mitigating, the aggravating is the crime itself, but the crime itself standing alone is never sufficient. You would have also had then the interview of Mr. Gillette, as you've indicated. But what you would have had on the mitigating side is a child that was addicted to alcohol beginning age nine, marijuana beginning at age 12, was a gang member beginning at a very young age, influenced by a brother that was a gang member. In fact, I think this case is incredibly analogous to Sears. And if the court would indulge me, I'd like to read some of what is set forth in Sears, because I think Sears demonstrates that the state habeas court unreasonably applied Strickland and its progeny. It talks about counsel's strategy. The jury was told that a death sentence would devastate the family. Counsel's mitigation theory, it seems, was calculated to portray the adverse impact of Sears' execution on his family loved one. It's exactly what we have in this case. But the strategy backfired. Prosecutor ultimately used the evidence of Sears' purportedly stable and advantage upbringing against him during the state's closing argument. With Sears, the prosecutor told the jury, we don't have a deprived child from an inner city whom society has turned its back on at an early age, but yet we have a person privileged in every way who has rejected every opportunity that was afforded him. The court also looked in Sears at the fact that Sears' brother was a convicted drug dealer and user and introduced Sears to a life of crime. It's exactly what we have in this same case. That would have actually been consistent with the mitigation theory portraying Sears as an individual with diminished judgment and reasoning skills, who may have desired to follow in the footsteps of an older brother who had shut him out of his life. The fact that Mr. Escamilla felt horrible guilt for the shooting that occurred when he was 11 years old that sent his brother to TYC falls exactly within this. Further, in Sears, you have this grandiose self-conception and evidence of his magical thinking. Dr. Pearson speaks nearly identically of that same issue. This evidence might not have made Sears any more likable to the jury, but it might well have helped the jury understand Sears and his horrendous acts, especially in light of his purportedly stable upbringing. Because the attorneys in Sears failed to conduct an adequate mitigation investigation, none of this evidence was known to counsel, and it only emerged during state habeas relief. In this particular case, the evidence would have been transformative. The state of Texas would have had to come up with an entirely new theory, and context could have been put into this case to appreciate Mr. Escamilla's violent act. I see my time is up. You've saved time for rebuttal, Ms. Penrose. Thank you.  Ms. Ferris. Thank you. May it please the court. The judgment of the district court should be affirmed for three reasons. First, AEDPA's relitigation bar precludes any finding that Strickland required trial counsel to discover Leach's alleged horrific childhood in the face of overwhelming evidence to the contrary. Second, AEDPA prohibits any second guessing of counsel's informed decisions not to present or pursue even more evidence of his childhood substance abuse or his family's criminal records. Finally, the state habeas court's no prejudice finding was reasonable in light of the very strong aggravating case the state put on. Turning to the first issue, Leto Escamilla's brief hinges on his argument that his counsel was constitutionally ineffective for failing to discover that his childhood was, as they term, a horror crash of violence and abuse. There are three points that are undisputed that should bar relief on this habeas claim. First, Leto does not dispute that the state habeas court found that there is absolutely no documentary evidence that Jose Sr. ever abused Lico or Lico's mother. In fact, the TYC records obtained from five years between the years of 1996 and 2000 explicitly refute this notion. Second, Leto does not dispute that, unlike in Rompilla, his counsel was in possession of the key evidence that the state said that it would rely upon, not only in the guilt phase, but also in sentencing. That evidence was his videotaped interview that he gave the day after he murdered Officer James in cold blood, in which he boasted of that murder and the murder of Michael Torres to a newsman. But that's not all he said in that interview. When the newsman asked whether there was anything that he would like to say to his family, he didn't say, dad, you ruined my childhood. You abused me. You gave me alcohol. You ruined my life. He didn't say that at all. Instead, he said, dad, I love you. I loved the way you raised me. You tried your best. OK, how do you respond then? I mean, are you saying the TYC unredacted records of the alcohol abuse at nine are wrong? I'm not necessarily saying those are wrong. And due to the reasons that our brief is sealed, I can't comment explicitly on what those records say. What I can say about those records, or at least in terms of how that they have phrased them, is that counsel was only deprived of a single piece of information as a result of their failure to find or to procure those unredacted records. And that is the age at which the drinking began. Isn't that kind of important? Because drinking at 20 is different from drinking at nine. That is important, but that's simply not the case here. Lico's complaint is that counsel essentially didn't have enough evidence of his substance abuse. It is simply not credible to say that his counsel did not know about both his drinking and his marijuana habits. The court credited Huff's statement that counsel did know about both of these. Huff said it, and the state habeas court credited that that was true. This court has to defer to that finding. But also, to buy the argument that Lico is making here today, you simply couldn't have been at the trial. The entirety of their case focused on his childhood substance abuse beginning at an early age. He began to get in trouble with the law for substance abuse shortly after he was beaten by two men at a children's birthday party at age 11. This is the case that his attorneys put on. Brenda testified extensively to his recurring problems after that incident and his inability to get treatment as he was in and out of TYC between the years of 1996 and 2000. She also testified that that use expanded exponentially after his mother's death. And I would also like to point out one fact that I don't have, unfortunately, the record citation in front of me, but I do believe that what Huff argued in his closing argument was not that counsel never used alcohol before his mother's death, but that liquor and guns were not involved in his life. I believe, this court will find, that there's ample evidence and testimony from witnesses Well, I mean, a nine-year-old with a beer is problematic, too. I mean, maybe there's parts of the world where a beer is considered the same as water, but for all its good and bad points, Texas isn't one of them. I mean, you're not supposed to drink beer when you're nine. Right. And anybody would say that's a problem. Anybody would say that that is certainly a problem. What I'm pointing out is that the way that opposing counsel has framed this is not exactly correct. If you look at what Huff actually said, there's no reason to think that that's a problem. OK, but I guess the basic bottom line of what your opponent is saying is that all of this is somewhat academic because his lawyers didn't bother to find all this out to be able to make this sifting that you're supposed to make. That you could say, well, we'll de-emphasize this. We'll emphasize that. If you don't know what you've got, you can't do that. That's her argument. I have three responses to that, Your Honor. The first would be that this court must credit the state habeas court's finding that the copy that they received from the state was replete with references to his drug abuse and alcohol abuse, even with the redactions. The state habeas court also found that his counsel was not deprived of significant information about the applicant's substance abuse. He has not overcome that by clear and convincing evidence. Second, Leto forgets that this court must entertain the possibility that counsel already knew of the missing information from other sources. Again, without confirming or denying the contents of these redactions, petitioner argues that counsel did not learn that Leto had admitted to using drugs and alcohol as early as age nine. Strickland's presumption of competence compels the conclusion that counsel already had this knowledge. To begin, we have to- OK, then how can you portray? I mean, I understand that kids can find a bottle of wine or beer or alcohol without their parents knowing about it. But it's kind of unlikely that you have a kid daily using beer, even beer, let's just say, quote, just beer, that this is going on more than one episode and the parents are not in some way at fault. I mean, I understand, again, that a kid can get into something with the best of parents. However, this going on on sort of a daily basis is either there is something very wrong with how the parents are keeping their alcohol or they know that he's doing this. Well, I have two responses to that. First, evidence that opposing counsel has presented say that he was abusing substances at other people's houses. In fact, he was asked to leave other people's houses because of the substance abuse. There's absolutely no evidence in this case that his parents have provided him with drugs or alcohol. In fact, every time TYC inquired, the family was found to have absolutely no substance abuse problem. So that's just not credible. We have to defer. What about the dad's arrest for being passed down in the car? That simply does not make him an alcoholic. That arrest was not even in the home. So this happened, I believe, in either 1989, 1991. He was never convicted. And there's no evidence that it ever happened again. Also, I would like to point out that it's very easy to believe that they already knew this evidence from talking to Brenda and to Jose Sr. They talked to him for four hours. Also, it is simply not true that counsel only spent 11 hours on their mitigation investigation. I actually have the quote from the state habeas court's finding that says, although Brenda, or although Busby personally spent, or altogether Busby personally spent over 11 hours with members of applicant's family. This is only about the time spent without. Why don't they have a mitigation or investigation file? I'm sorry, I'm not sure if I'm. Well, your opponent keeps saying they don't even have a file. This is so deficient, they don't even have a file. So I'm asking, why don't they have a file? They do have a file. Here they have the medical records, his school records, and his redacted TYC records. And the first page of those redacted TYC records say that they're redacted, the things that are redacted are confidential alcohol and drug patient information. They know they're not missing other facets. All they're missing is that particular piece of the pie, if they're missing that. But Penholster says that we have to presume, we have to not only give counsel the benefit of the doubt, but we also have to entertain the possible reasons that counsel may have had for proceeding as they did. And the most obvious of these reasons, well, there are two obvious reasons that counsel could have had for not obtaining those particular unredacted records. The first is that they already knew the information. They spent four hours in the first meeting talking to Brenda, who's a substance abuse counselor. The state habeas courts credits Busby's description of this conversation. She knows a lot about substance abuse. They know about his drug and alcohol dependency from these talks. It's very possible she knows the age at which he started drinking. Also, it's not reasonable to presume here that the reason that counsel didn't present this information was because they didn't know about it. It's equally plausible, and this court has to give the benefit of the doubt to this possibility, that the reason that it wasn't presented is because it isn't helpful. If anything, it shows that Lito Escamilla is basically a lawbreaker, a drunk, at the age of eight or nine before he's ever been beaten. But at eight years old, we don't ascribe the blame to the child that we ascribe when somebody's 28. When somebody's 28 and a drunk, a lot of people will blame them, and I don't mean any disrespect to people who have an alcohol problem and work on it, whatever, but the public may blame a 28-year-old for their problems. How can you blame an eight-year-old for drinking beer? I mean, they're not old enough to be blameworthy in that circumstance. Isn't that the whole idea? Yeah. Here, there's no reason to think that his parents had anything to do with that. We have no documentary evidence. But even so, their whole point is, we needed a complete picture. This is a kid who, at five years old, is already beating up everybody at the daycare, at eight years old, is getting drunk, or nine years old, is getting drunk. This is a kid who has problems from the start. So are you saying he's just an evil child that should then grow up to be executed? No, not at all, Your Honor. I would point out that counsel is wrong to the extent that they suggest that his defense counsel portrayed an idyllic childhood. That was not portrayed at all. What was portrayed was perhaps a more sympathetic case, an arguably more sympathetic case, that his substance abuse began at a very early age, but also after there was a trigger. What was that trigger? That trigger was the incident in which he's violently beaten at a children's birthday party by grown adult men. His brother is arrested for that offense. He's incarcerated in TYC. And Ligo feels great blame for that. We know that from Brenda's testimony. It's not clear what benefit he could have possibly gotten from showing the jury that that started at eight or nine, when, per his brother Juan's letter, his mother's coming home at four o'clock every night and cooking for the family. This is the same type of double-sided evidence that's in the affidavit of Vicki White. It says at age five, he's already a terror. He's stomping on other children as they sleep for no reason. And this accords perfectly with what Dr. Pearson found when he evaluated him. He found that he's very violent and dearly loves his family, but he's actually really violent to other people. He has an antisocial personality. So, I mean, you're just saying that, I guess I'm trying to understand this, that he's inherently a bad person from the start, that just some, you know, I mean, I hate to use the phrase evil seed, but it almost seems that that's your argument. My argument is that counsel's, there's at least a reasonable argument that counsel was not, or that Lito Escamilla was not prejudiced by the failure to present this information. We know that's true from Penholster. Okay, because you're saying that had this thing about him at five screaming at everybody come out, that there, that could be viewed as, boy, this kid really needed help that he never got, or it could be viewed as this was an unsalvageable child. That's what you're arguing? The words- That it's double-edged or whatever? Yes, the words that Penholster used in explaining why it wasn't prejudicial for counsel not to put in even more evidence of substance abuse was that the jury might have concluded that Penholster was simply beyond rehabilitation. That's what the Supreme Court has acknowledged is a possibility that's out there, and that's why he's not prejudiced in this case by that particular error. Also, I would like to point this court to the quote from Richter, which says, while in some instances, even an isolated error can support an ineffective assistance claim if it is sufficiently egregious and prejudicial, it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy. That is exactly what happened here, and Petitioner can't show even a strickling violation, much less overcome doubled efforts on that point. What is your answer to the Terry Nichols, Zacharias Moussaoui argument that their crimes were more heinous, and yet they didn't get the death sentence, so it's doable? Thank you. I have a few responses to that. First, I would direct this court to Wong versus Belmontis. There, the Supreme Court says that it is hard to imagine expert testimony and additional facts about Belmontis' difficult childhood outweighing the facts of the murder. It becomes even harder to envision such a result when the evidence that Belmontis committed another murder, which the court then terms the most powerful imaginable aggravating evidence possible is before the jury. Here, that's what we have. We know that by Lico Escamilla's own admission, just a few days before, he's murdered Michael Torres in cold blood. The jury heard that. There's just no reason to think that hearing that he was drinking at eight or nine instead of 11 or 13 is really going to sway the jury when they've already heard some evidence of his childhood substance abuse and they've still condemned him to the death penalty. Also, this circuit has held that when there's evidence of future dangerous and that future dangerousness evidence is overwhelming, it is virtually impossible to establish prejudice. Here, we have the most powerful evidence of future dangerousness possible. It's simply not possible to establish prejudice here. In all this court- You mean the two murders plus the laughing and whatever with Budgillette? Right, this case is a lot like Penholster. The court there says that it's impossible for the petitioner to make the Oedipus showing on prejudice where the jury has already heard him glory in his crimes. That's what happened in Penholster and that's what happened here. The jury's already heard him on videotape bragging about killing Officer James in cold blood and not only that, but bragging about killing Michael Torres as well. There's simply no reason to think that this extraneous evidence that Licho has not even proven that his counsel didn't know about somehow prejudiced the proceedings. And again, this court, the question isn't whether this court disagrees with the state habeas court's finding. It's whether all reasonable jurists would disagree with the state court's finding and Licho simply has not shown that here. I would also like to point out a few key distinctions between Wiggins and Rompia in this case. This is nothing like Wiggins. There, the counsel failed to follow up on information in the social services records that stared them in the face regarding his abusive and neglected childhood. The court in that case further explained that counsel uncovered no evidence in their investigation to suggest that further investigation would have been fruitless. Here, counsel uncovered a mountain of evidence that further investigation would have been fruitless. We have TYC documents, extensive TYC documents saying the petitioner was never abused. We have not only that, but we have a consistent story from every single witness that was contacted saying either he was not abused or if they weren't asked that question, giving a positive impression of the Escamilla family and conveying that Jose Sr. is a good father. In fact, from 1996 until the time the state habeas court heard this evidence, Licho Escamilla's story was consistent. It was perfectly consistent. I love my father. I appreciate the way my father raised me. I was not abused. In fact, the TYC records do not even reflect so much as physical punishment of Licho Escamilla. Now, Licho also argues that his trial counsel failed to learn of his abusive and violent upbringing due to their cursory mitigation investigation. The state habeas court flatly disagreed with that and he has not overcome any of the fact findings on that point by clear and convincing evidence. To begin, Licho even acknowledges on pages 24 and 25 of his brief that his trial counsel had his medical records, his redacted TYC records, and his school records. This plainly distinguishes this case from both Rompilla and Sears. In Sears, the court found, I believe the state habeas court found that the investigation was deficient on its face because it consisted only of one day of interviews of witnesses supplied by the defendant's mother. That's not what happened here. We know from the state habeas court's finding that counsel not only talked to numerous family members and every friend they could find, but they also conducted a searching review of the documentary evidence. Also, there's just no merit to the assertion that counsel's investigation was only six hours long. The state habeas court never found that. Also, a single contradictory affidavit stating that the first meeting lasted one hour as opposed to four hours, as Busby claims, simply doesn't hold water under AEDPA here. 2254E demands clear and convincing evidence to the contrary, and Trotti says that a single contradictory affidavit does not suffice. Also, they hired an investigator who identified family and friends, and not only that, but they hired a lot of expert assistants. They hired Dr. Pearson and Dr. Crowder well in advance of trial, far before the timeline described in Van Cook. This far exceeds the investigation in Sears, and it also outstrips that which occurred in Penholster. In Penholster, the court found no merit on the habeas ineffective assistance claim, where the evidence was that there was six hours of talking to the mother. There was some presumed preparation of the brother for the punishment phase proceedings, and also some indications that counsel had spent at least some time reviewing the California notice rule. There were affidavits in that case from Penholster's counsel saying that they could not recall anyone that they interviewed except for Penholster's mother, and they also couldn't recall ever pulling his documentary records. Now, this is what sufficed under Penholster to support the state habeas court's finding of no ineffective assistance. We have far, far more than that here. There's simply no argument that the state habeas court's resolution was unreasonable. Also, we have a problem in terms of his allegations of an alcoholic father, and an abusive and violent upbringing. Because there are no documentary evidence that support this theory, he has to be able to get it in through witness testimony in order to show prejudice. But this is a big problem for Alicio. There's not a single person that he identifies who is available and willing to testify at his trial who would have acknowledged any of this. Right now, there are a few affidavits from persons such as Maria Escamilla. I believe she's the only person who provides an affidavit that attests to any abuse whatsoever. But she doesn't say that she would have testified to this abuse. In fact, she was at petitioner's trial and she didn't testify. Also, we know that the state habeas court credited Busby's testimony  and that story contradicted abuse and neglect. Maria is one of those people that they talk to and we have absolutely no explanation for why her story has changed. In short, petitioner on this point simply has not overcome with clear and convincing evidence the state habeas court's crucial finding that there was no evidence of the sort that was reasonably available at the time of trial. Nothing that counsel could have done would have uncovered it. Next, I would like to turn to the point that it was reasonable for the court to conclude that counsel was not ineffective for failing to discover and present enough evidence of his family criminality. The COA grant reflects Leach's incorrect statement that by counsel's admission, they neglected to obtain the publicly available arrest records of Leach's family members. The state habeas court here found the very opposite. As to his brothers, the court found that Busby did find their criminal records and Busby said that she found them. In fact, Brenda presented significant testimony on Jose Jr's shooting of one of Leach's childhood assailants and his subsequent incarceration in TYC for that crime. We also know that he wasn't prejudiced by any failure to present evidence of the additional arrests and that's because they all occur either right before Leach turns 18, this is the arrest in the house with drugs of Jose Jr that opposing counsel discusses, but this really can't be a formative event in Leach's life because he's already locked up by that time. He's already almost not a minor anymore. By this point, Leach has already been stealing cars at age 13 back in 1996. In 1997, he's beating an assistant principal with a tire iron. If anything, this is very double-sided or perhaps even only harmful evidence that could have come in. It would have suggested that Leach, perhaps, was the instigator of any family criminality in the estate. Well, I think the argument is that just, you know, it's sort of a racist argument about families that maybe you have one bad actor even if you have good parents, but that good parents wouldn't turn out this many bad kids. That's their argument. I'm not agreeing or disagreeing with that. I'm just saying that's their argument. Right, and I would agree with your honor that that's a fair point, but your honor also used the term parents, parents plural, and we have a reason to think that something about the parents is causing this. We know from the evidence that they put on that the beloved matriarch, who everyone agrees was an excellent mother, loved and adored her children, particularly Leacho, until the day she died. Is very sick by the time, you know, we get around to 2000. She has diabetes. And we also know not only from the powerful evidence that was put on at trial, but from the evidence that Leacho obtained in the state habeas court that her death has a profound impact on the family. She dies in October of 2000. This is a great explanation for not only Leacho's crimes, but also the crimes of his brothers. In fact, we know from Brenda's affidavit that when Brenda is asked why a petitioner might've committed these crimes, she gives a very explicit answer. She says, Leacho fell apart after his mother's death. He adored her. She was the linchpin that held the family together. After she died, everything went bad. I would also like to return to the point that his father has no criminal convictions, absolutely none. We know that he has two arrests back in 1989, 1991. To our knowledge, or to the state habeas court's knowledge, he was never arrested again. This is significant. We know that he's hardworking. Both he and his mother are working every day, apparently, to provide for the family. This simply does not support the horror crush of violence and abuse at the hands of Leacho's father that counsel here is claiming. Also, there's a very good reason why counsel wouldn't have put on this evidence. When your client's life hangs in the balance and the father here is one of the few people willing to go to bat for Leacho, why in the world would you impugn his testimony with such weak evidence? He's been arrested twice. He's never been convicted. These are not violent arrests. These do not even indicate alcoholism. There's one alcohol arrest, not even two. It just simply makes- Wasn't an arrest even admissible to impeach a witness? I don't, I'm not actually sure on that point, Your Honor, but I don't believe so. It's not? I think you're correct. And I would also like to close by addressing prejudice. Leacho has not shown that the state habeas court was not only simply wrong, but actually unreasonable in finding that there was not a substantial likelihood of a different sentence, but for counsel's unprofessional errors. Richter tells us that there is very little daylight between Strickland's prejudice standard and a more probable than not standard. That difference matters only in the rarest of cases, and that is not the case here. As in Wong, this is a senseless crime. This is a very strong aggravating factor. It's not necessarily as gruesome as some other cases. The body count isn't as high, but it is senseless. He's already- Well, Tim McVeigh did get the death penalty, by the way, I should point out. Go ahead. Thank you, Your Honor, that is very helpful. He's running away. He's already shot these two officers. He's disabled Officer James's gun. He is running away, and instead of making his getaway, he turns around, stands over him, and pumps three bullets into his head. There's no reason whatsoever for this type of a crime. Also, future dangerousness here is overwhelming. We have the additional murder, which is the strongest possible aggravating evidence, but we also have other violent acts. We have the beating of the assistant principal. This is simply very, very strong evidence that would have been incredibly difficult to overcome. This is also combined with a profound lack of remorse. I would like to direct this court back to Pinholster, where the court denied habeas relief on a very similar claim. In Pinholster, you have a very similar defendant. He's very unsympathetic. The jury has heard him boasting about his crimes. Also, there's a psychologist or psychiatrist who's consulted, who finds that he's antisocial, that he's psychotic, but there are no other explanations for his mental state, and no organic brain damage. In that case, the court finds absolutely nothing justifying habeas relief, and the court says, in that case, that's a great case for family sympathy. Here, we have not only family sympathy, but a very, very powerful and moving story explaining why Lico became the person that he is today. For these reasons, the state requests that the court affirm the judgment of the district court. All right, thank you, Ms. Ferris. And Rose, you saved time for a vote. Thank you, your honors. The state would have this court believe that it's reasonable for attorneys to have facts in their possession and choose to be complicit with the state in providing an entirely distinct portrayal to the jury. The age nine matters. It's significant in this case, and I think it's patently unreasonable for attorneys that have accurate data to decide not to give that accurate data to the jury. As I indicated previously, that violates the governing ABA standards at the time. I'd like to return to the issue of prejudice quite briefly. In Williams, Terry Williams versus Taylor, you had an individual that killed one person for a couple of dollars. He put a second person in a permanent vegetative state. Previous to that, he was involved in an armed robbery, burglary, grand larceny. He had two auto thefts, two separate violent assaults on elderly victims, and committed arson in jail. United States Supreme Court granted him relief after AEDPA and found prejudice in his case. Likewise, when we go to Rompilla, where the court also fined following AEDPA, prejudice, and returned this case as well for a sentencing proceeding, Mr. Rompilla repeatedly stabbed his victim and set the body on fire. I think that's two additional examples this court can look to, where the United States Supreme Court considers not simply the crime, but considers the constitutional right of the effective assistance of counsel to have your attorney present an accurate  I would like to correct a couple of things stated by the state. First, there are three affidavits in the record that were provided for the state to the state habeas court. All three of these individuals testified under oath, admissible in the proceeding, that Mr. Escamilla, Sr., the father, actually hit his wife, Marie Escamilla. Her affidavit is November 9th, 2005. She said he hit his mother with a fist and a belt. She saw that. Margaret Barajas, October 30th, 2005, said, he hit her, I saw bruises. Luis Gonzalez, October 30th, 2005, Maria was beaten and I saw a black eye. I consider that very clear testimony that there was. Did those last two say that they saw what caused the bruises and black eye, or just that they saw the bruises and black eye? They saw the bruises and black eye and they were familiar or aware that Ms. Escamilla. They drew the conclusion that it came from Jose. Yes, Your Honor. Further, I'd like to return to the question, Judge Haynes, you raised about the existence of a file. There is no independent file in this case. The quote unquote file is the state's file. I do not know of any other case where attorneys relied simply, and it isn't the state's complete file. They didn't get the unredacted records. I honestly don't know how any court is going to arrive at the fact that it's reasonable to rely on the state's redacted records when you know the state is relying on separate and distinct records. But relying on, I mean, they didn't introduce those against him. That's what happened in Rompia, was they introduced the relied upon stuff against Rompia that the lawyer didn't go look at. But I didn't understand that to be the case here. It's not, it is the case in this regard, Your Honor. The state's the only entity that has the fact that this is a child that beginning at age nine is addicted to alcohol. So when the attorney of that client stands up and says, oh, his trouble started at age 11, the state goes, good thing we had the records and they don't have the records. But that's different from them using it against him. I appreciate there's a factual nuance. I think the United States Supreme Court looking at Strickland and its progeny is going to say that an attorney's failure to obtain the unredacted records that you know the state requested is constitutionally ineffective. While respondents seek to rely on the procedural default rules of Harrington versus Richter, your petitioner also encourages this court to focus on Justice Kennedy's opinion in that particular case, which reminds the pivotal questions whether the state court's application of the Strickland standard was unreasonable. Blind deference to trial counsel's nearly identical affidavits, and you should look at them side by side, unattended by any documentation of how their 11 hours were expended. While the state said there were more than 11 hours, it's not in the record, it's not in the affidavit, we have no file, we have no documentary proof. We have no evidence of any independent investigation. We have no witness list beyond the two family members. We have no explanation of why with awareness that both the petitioner's brothers were then in state or federal custody, counsel chose to let the state argue that this is the one bad apple in the state. Mr. Eskami argues that no fair-minded jurist would agree that such minimal work and the 11th hour retention of a psychiatric expert who based his assessment on a false family history would deem trial counsel's investigation consistent with Strickland versus Washington. Thank you, your honors. All right, thank you, Ms. Penrose. We appreciate your willingness to take the appointment and your effective advocacy on behalf of your client. Your case is under submission and the court is in recess.